Filed 5/19/14  P. v. Perez CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038986 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1113673) |
| v. | |
| FERNANDO ANDY PEREZ, | |
| Defendant and Appellant. | |

Upon guilty verdicts on four counts of aggravated sexual assault of a child and three counts of lewd or lascivious act on a child, defendant Fernando Andy Perez was sentenced to 270 years to life in prison.  Defendant assigns error to two evidentiary rulings and the prosecution's amendment of the information to charge a prior strike offense after the close of evidence.  Finding no merit to defendant's arguments, we will affirm the judgment.

## I.  TRIAL COURT PROCEEDINGS

### A.    THE CHARGING DOCUMENTS

On April 12, 2012, the People filed an information against defendant alleging four counts of aggravated sexual assault of a child under the age of 14 and 10 or more years younger than the defendant.  (Pen. Code, §  269; counts one – four.)[1]  The underlying offenses supporting the section 269 allegations were rape (§ 261, subd. (a)(2); count one),

---

[1] Unspecified statutory references are to the Penal Code.

sexual penetration by a foreign object (§ 289, subd. (a); count two), oral copulation (§ 288a; count three), and sodomy (§ 286; count four). The information further alleged three counts of committing a lewd or lascivious act on a child by force. (§ 288, subd. (b)(2); counts five – seven.) With respect to counts four, five, six and seven, the information further alleged that defendant was convicted of a prior offense within the meaning of section 667.61, subdivisions (a) and (d) (the one strike law). The prior conviction, for committing a lewd or lascivious act on a child under 14 (§ 288, subd. (a)), was in Stanislaus County Superior Court case No. 188030 (the Stanislaus County conviction). That offense occurred in February 1998.

The prosecutor amended the information during trial to charge the Stanislaus County conviction as a violent or serious felony under California's three strikes law (§§ 667, subds. (b)–(i), 1170.12). The prosecutor requested the amendment after the close of evidence but before closing argument, noting that the Stanislaus County conviction had been alleged in the information (but not as a prior strike), and had been provided to defendant and presented to the jury in testimony and as an exhibit. The prosecutor requested the amendment after reading from Penal Code section 969, subdivision (a), providing for amendment of a pending information when it is discovered that the information does not charge all prior felonies of which the defendant has been convicted. Defendant objected to the amendment, arguing that it was untimely under the Fifth, Sixth, and Fourteenth Amendments, and California's constitutional corollaries. The court allowed the amendment noting that no prejudice resulted because defendant had been on notice of the charge.

## B.   THE PROSECUTION'S CASE

### 1.   Destiny's Testimony

Destiny was born in late August 1997. She was just shy of 15 years old at defendant's August 2012 trial. Defendant married Destiny's grandmother in August 2008 when Destiny was ten years old and entering the sixth grade. Destiny lived

in her grandmother's house with her three siblings, her mother, her stepfather, and her grandmother. Defendant moved into the family home before he and Destiny's grandmother married. Destiny had her own bedroom, and the garage was converted to a bedroom which Destiny's grandmother shared with defendant. Destiny's grandmother was sick when she married defendant, and she died two months later, in October 2008, waiting for an organ transplant. Defendant was like a grandfather to Destiny while her grandmother was alive. Destiny's grandmother and defendant babysat Destiny and her siblings frequently. Defendant continued to live in the family home after Destiny's grandmother died.

After the death of Destiny's grandmother, defendant penetrated Destiny's vagina with his finger. Destiny was in sixth grade when it first happened. Destiny was watching television in defendant's bedroom with her siblings and defendant, and her parents were in their bedroom in the back of the house. When the younger children left the bedroom, defendant locked the door and returned to the bed where Destiny was sitting. Defendant pushed Destiny on her back, got on top of her, and pulled down her pants and underwear. Defendant removed his pants and underwear, pinned Destiny down, and inserted his finger into her vagina. She told him it hurt, and he told her to shut up. After masturbating and ejaculating, defendant let Destiny leave the room. Before releasing her, he told her not to tell anyone what he had done or she would lose her mother. Destiny complied because she was scared and believed she would lose her mother the way she lost her grandmother. During Destiny's sixth grade school year, defendant locked Destiny in his bedroom and digitally penetrated her "too many times."

Defendant also forced his penis in Destiny's mouth when Destiny was in sixth grade. The first time it happened, Destiny thought defendant was going to digitally penetrate her. But instead defendant removed his pants and underwear, and told Destiny to get down on her knees. Destiny obeyed because she was scared and thought he would hurt her if she said no. Defendant pulled Destiny's head close to his penis and told her to

open her mouth.  He pushed his erect penis into her mouth and ejaculated.  Then he released her.

Defendant also had vaginal intercourse with Destiny when she was in sixth grade.  The first time it happened Destiny was eating and watching television in defendant's bedroom.  Defendant came home, entered the bedroom and locked the door behind him.  This signaled to Destiny that something bad was going to happen.  Defendant pushed Destiny, who was sitting on the edge of the bed, onto her back.  He removed her pants and underwear and his pants and underwear.  He lay on top of her and was too heavy for her to push off.  Defendant inserted his penis into Destiny's vagina.  Destiny cried and told him it hurt.  He told her to be quiet.  Defendant ejaculated in Destiny's vagina.  After releasing her, Destiny went to the bathroom and discovered that she was bleeding.  She wanted to tell her mother what had happened, but she remembered defendant telling her she would lose her mother and she could not allow that to happen because her mother was "all [she] ha[d]."  Defendant had intercourse with Destiny at least two more times while she was in the sixth grade.  He did not wear a condom.

The summer before seventh grade, defendant digitally penetrated Destiny's vagina multiple times–usually more than once a week.  He also forced Destiny to orally copulate him.  Toward the end of that summer, just before Destiny turned twelve, defendant penetrated Destiny's anus with his penis and ejaculated inside her.  Destiny tried to fight off defendant, but he overpowered her.  Defendant sodomized Destiny at least three more times before seventh grade started.

During seventh grade, defendant continued to engage Destiny in vaginal intercourse, sodomy, and oral copulation, and to digitally penetrate Destiny's vagina, all against Destiny's will.  The sexual abuse was on-going, occurring on at least a weekly basis and sometimes on a daily basis.  Destiny became numb to it; she knew what defendant wanted and she just lay there.  All of the sex acts occurred in defendant's bedroom.  Sometimes Destiny would go into the bedroom to watch television and

defendant would lock the door and touch her. Sometimes defendant pulled her into his bedroom. Sometimes Destiny's mother and stepfather were home.

The jurors were instructed at the beginning of trial that if they had questions they wished to be asked of a witness, they could submit them in writing for consideration by the court and counsel. In response to a juror question "why did Destiny seem to favor the garage bedroom considering all the -- all her bad experiences there?" Destiny explained: "I went back in there just so things wouldn't look suspicious and I wouldn't look scared. [¶] Like, so it would be like we were just like a normal family, like nothing was going on, like I wasn't being hurt and I wasn't scared. So I just tried to be as normal as I could."

Defendant's last vaginal intercourse with Destiny occurred in April 2011, when Destiny was in eighth grade. That time Destiny resisted and tried to get out of the bedroom. But defendant stood between her and the bedroom door. A month later Destiny successfully fended off an assault by defendant. Defendant pulled Destiny into his bedroom but she held onto her clothes as he tried to remove them. She also kicked him in the groin and scratched him. He released his hold and Destiny ran past him.

After missing her period and gaining 20 pounds in two months, in August 2011 Destiny told a girlfriend what defendant had been doing to her "since she was 10." The girlfriend told Destiny to tell her mother. Destiny was scared she would lose her mother, and worried that her family would not believe her and she would get in trouble. But Destiny's friend told her that what defendant was doing was not right, that her family would believe her, and that she would not lose her mother. That advice was a huge relief to Destiny.

The next day Destiny broke down and told her mother that she had been keeping something from her for several years. She told her mother what defendant had been doing to her and that she might be pregnant. Destiny gave a statement to a police

detective and was examined by a doctor. She was five months pregnant. In December 2011 Destiny gave birth to a baby boy.

## 2. Destiny's Mother's Testimony

Defendant dated Destiny's grandmother on and off for about ten years. He moved into the family home just before they married in August 2008, and he continued living in the family home after she died because everyone got along. Destiny's mother never suspected that defendant was touching her daughter in a sexually inappropriate manner. Destiny's mother noticed Destiny was sad after her grandmother died, but she attributed it to the death.

In August 2011, the day after Destiny had a sleep over with a girlfriend, Destiny's mother took the girls to Walgreens. Destiny became very upset because someone in the store made a comment that she looked fat or pregnant. Destiny's mother tried to console her crying daughter by explaining that teenagers are not always skinny, but Destiny just grew more upset. She told her mother that she was scared and, after being prodded by her girlfriend, she told her mother that defendant was touching her and had been inside of her. Destiny said it had been going on for a while and the last time it happened she did not get her period. Her mother was surprised and angry; she could not believe she had never suspected anything. Because Destiny was very upset, her mother did not press her for details. They returned home and her mother called the police. Then she took Destiny to the hospital and learned she was pregnant.

## 3. DNA Expert Testimony

A DNA expert analyzed DNA collected from defendant, Destiny, and Destiny's baby. That analysis established with statistical certainty that defendant was the baby's father.

## 4. Elizabeth Doe's Testimony

Elizabeth Doe, age 24 at trial, was defendant's grandniece. Her grandfather was defendant's brother. When Elizabeth was a girl, defendant was babysitting her and her

two-year-old cousin.  Elizabeth was sitting on the sofa in the living room watching television.  Defendant, who also was sitting on the sofa, moved next to Elizabeth and put his arm around her shoulder.  He grabbed her hand and had Elizabeth rub his penis over his clothes.  Defendant's penis felt hard.  She felt uncomfortable and tried to close her hand but he grabbed her fingers and pulled them open.  Defendant also touched Elizabeth between her legs.

Elizabeth was scared, so she left the house looking for help.  When her aunt and grandmother returned a short time later, she told them what had happened, and her aunt took her to the police station.  Elizabeth did not remember all the details she had provided to the police 14 years earlier.  The court admitted into evidence the complaint, a minute order, and an abstract of judgment showing defendant's 1998 Stanislaus County conviction for the touching described by Elizabeth.  According to the complaint, the offense occurred when Elizabeth was 11 years old.

Defendant also touched Elizabeth at her grandmother's house three or four years earlier.  Defendant put Elizabeth on his lap and touched her vagina over her clothes several times during a family gathering.  He also told her not to tell anyone or he would hurt her grandmother and her family.  She did not tell anyone because his threat scared her.

## C.    THE DEFENSE CASE

Defendant, 51 years old at trial, testified in his defense.  After dating Destiny's grandmother and moving in with her and her family, they married in August 2008.  Defendant's wife died two months later, and defendant, who continued living with the family, mourned the loss every day.  Defendant helped with household chores, took the children to school, and babysat.

Defendant denied having any sexual contact with Destiny before she was 13 years old.  When she was 13, they had sexual intercourse four times, and Destiny initiated the sexual contact each time.  The first time Destiny kissed defendant they were in the living

room watching television. Destiny was playing around with defendant—punching and hitting him. Then she kissed him on the lips. He told her "that's enough" and went into his bedroom. Destiny followed him, lay on the bed next to him, and started kissing him again. He said "we better stop." But she kissed him again and, after he closed the door, they "just had sex." Defendant ejaculated during the sex. Afterwards, he told her "let's stop, because," and then he left the house.

Defendant and Destiny had sex a second time three days later. They were watching television in defendant's room and Destiny started "falling against" him. He told her to "get up," and "I don't want to do anything," but it just started happening again. Destiny initiated sex by kissing defendant on the lips in a romantic way. He closed the door, they had intercourse, and he digitally penetrated Destiny's vagina. Destiny liked it, but he felt shame and was afraid of getting caught.

The third sexual encounter occurred a week after the second encounter, when Destiny came into defendant's bedroom in the morning while he was asleep. Destiny was kicking and punching and teasing defendant. He told her to stop but she kissed him on the lips with an open mouth, she closed and locked the door, she took off her clothes, and they "started having sex again." During the encounter Destiny seemed happy.

The fourth sexual encounter followed about two weeks later, when Destiny joined defendant in his bedroom to watch television. Although he "just wanted it to stop," Destiny put her arms around his neck, pulled him down, and started kissing him romantically on the lips. Defendant closed the door, they each took off their own clothes, and they started having sex. He told her it had to stop, but she persisted and the sex continued. Destiny was happy after the intercourse.

Defendant never forced himself on Destiny, sodomized her, or forced her to orally copulate him. He never threatened Destiny. She lied "about everything" except having intercourse. Defendant outweighed Destiny by 100 pounds and could physically

overpower her. He never asked Destiny to leave the room before his sexual feelings overtook him because he did not want to hurt her feelings or be rude.

Defendant was not attracted to Destiny at age 11, but when she was 13 and they were having sex, she was developed and looked like a woman. He knew what he was doing was wrong, but he succumbed to the weakness of the flesh.

As a convicted sex offender, defendant was required to keep his address updated with the local police department. Even though he lived with Destiny's family for over three years, he never informed police of that living arrangement.

Defendant admitted putting Elizabeth on his lap, holding her, and putting his hands between her legs when she was about 11. Even though lots of other children were at the house and jumping on his lap, he did not touch them between their legs. He did not know why he singled out Elizabeth and touched her between her legs but not the other children. Although he admitted finding it sexually arousing to touch Elizabeth between her legs, he attributed the touching to being strung out, a drug addict, and drunk at the time. Defendant admitted to abusing drugs from age 12 until his August 2011 arrest, but he was never under the influence of drugs or alcohol when he had sex with Destiny.

Defendant admitted to grabbing Elizabeth's hand and forcing her to touch his penis over his clothes. But he denied making any threats to Elizabeth that he would hurt her grandmother. He admitted the Stanislaus County offense because he was guilty.

## D.   THE VERDICTS AND SENTENCING

The jury found defendant guilty on all counts as charged, and the court found the strike allegations to be true and the prior conviction to be a serious felony. Defendant was sentenced to consecutive 30-years-to-life terms on counts one through four and 50-years-to-life terms on counts five through seven, for a total prison term of 270 years to life. He timely appeals.

## II.  DISCUSSION

### A.    EVIDENTIARY RULINGS

Defendant contends that the combined impact of two erroneous evidentiary rulings violated his due process right to a fair trial.  The first ruling involved the prosecutor's references to rape during Destiny's direct examination.  In the second challenged ruling, the trial court sustained the prosecutor's objection to a reference to consent in defendant's direct examination.

"Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence."  (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)  And "state law error in admitting evidence is subject to the traditional *Watson* test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. [Citations.]."  (*People v. Partida* (2005) 37 Cal.4th 428, 449; accord Evid. Code, § 353, subd. (b) [a judgment shall not be set aside based on the erroneous admission of evidence unless "the error or errors complained of resulted in a miscarriage of justice."].)

### 1.    Referencing "Rape"

After both the prosecutor and Destiny described the vaginal intercourse between defendant and Destiny as defendant putting or forcing his penis in Destiny's vagina, the prosecutor asked:  "In the summer between sixth and seventh grade, were the times that he was raping you, did they start to go up in frequency?"  Destiny responded yes.  She also responded yes when asked: "would the defendant touch or rape you more when your stepfather was out of the house?"  The prosecutor then asked Destiny "Was there ever blood coming from your vagina after the first time that he raped you?"  On this third occasion, defendant objected "to the legal conclusion used in the questions[.]"  The court overruled the objection without argument or elaboration.

Direct examination continued with both the prosecutor and Destiny describing the sexual intercourse as defendant putting his penis in Destiny's vagina.  After Destiny used

the word rape to describe anal sex, the prosecutor clarified her meaning of the word rape: "Do you remember the last time that he raped you—that he put his penis in your vagina?" Destiny answered "Yes." The prosecutor then asked Destiny to describe the last time defendant raped her. During that colloquy when Destiny said that defendant raped her, the prosecutor followed up: "And when you say 'raped,' did he put his penis in your vagina?" Destiny answered "Yes." After that clarification, the prosecutor stopped using the word rape in Destiny's direct examination, and instead referred to sexual intercourse by using the phrase "put his penis in your vagina."

Defendant argues that the court's ruling was erroneous because rape is a term with technical and legalistic meaning, citing *People v. Hughes* (2002) 27 Cal.4th 287, 349–350, acknowledging the legal definition of rape. We agree with defendant that rape does have a legal meaning in the context of this case. Count one (§ 269, subd. (a)(2), sexual assault of a child under the age of 14 by rape) required the prosecution to prove defendant raped Destiny. To establish rape, the jury had to find: (1) defendant had sexual intercourse with Destiny; (2) defendant and Destiny were not married; (3) Destiny did not consent to the intercourse; and (4) defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to Destiny or another person. (CALCRIM No. 1000: Rape by Force, Fear, or Threats.) CALCRIM No. 1000 defines sexual intercourse as "any penetration, no matter how slight, of the vagina or genitalia by the penis." (CALCRIM No. 1000.) CALCRIM No. 1000 also defines consent: "To consent, a female must act freely and voluntarily and know the nature of the act." Thus, rape is a legal conclusion composed of several factual layers, each of which must be proven to the jury.

At the same time, the term 'rape' is commonly used in the vernacular. Thus, while lay "[w]itnesses must ordinarily testify to facts, leaving the drawing of inferences or conclusions to the jury or court." (*Froomer v. Drollinger* (1962) 201 Cal.App.2d 90, 98), usage of the term 'rape' does not necessarily constitute an opinion on a question of law.

(*State v. Goss* (1977) 293 N.C. 147, 154.) *Goss* considered the context of the testimony, concluding that the witness's "use of the term 'rape' was clearly a convenient shorthand term, amply defined by the balance of her testimony." (See *State v. Sneedon* (1968) 274 N.C. 498, 501 [same]). Other factors that may bear on a determination whether references to 'rape' during trial constitute an impermissible legal opinion are whether the term is introduced by the witness or in questions by counsel (see *People v. Callahan* (1999) 74 Cal.App.4th 356, 380 [allowing opinion evidence when witness cannot adequately describe her observations without using opinion words]); whether the term is used on direct examination, or on cross or redirect examination to impeach or refute prior testimony; whether the witness describes the meaning of the term; and whether the jury is admonished or instructed regarding the witness's use of the term in a colloquial rather than legal way. Regardless of whether an objection is sustained or overruled, it is the responsibility of the court and counsel to ensure that the terminology is clear and that the jury is not mislead by its usage.

Here, although the court did not admonish the jury regarding the term's vernacular use, after introducing the term 'rape' the prosecutor twice clarified her usage as meaning defendant putting his penis in Destiny's vagina.

We need not decide whether the trial court committed error in overruling the objection because any error is harmless for several reasons. First, the record shows the prosecutor was using the word rape as an alternative to defendant putting his penis in Destiny's vagina, and Destiny confirmed that she understood the word to have that meaning. Second, the prosecutor's references to rape were few, with references to defendant putting his penis in Destiny's vagina far more prevalent in Destiny's testimony. Third, the jury was properly instructed on the elements of rape, and the prosecutor never argued that she proved those elements by any conclusory references to rape made during Destiny's direct examination. Fourth, defendant's own testimony reflected that rape had occurred, albeit statutory rape. In arguing to the jury that the

sexual intercourse was consensual and not forcible, defense counsel explained the difference between the charged rape and uncharged statutory rape: "The law does provide that minors are not allowed to have sex. That's a crime of statutory rape. Statutory rape is quite different than forcible rape, though. Just because a minor is having sex, does not automatically mean it is forcible, or caused by duress, or menace, or fear." Finally, as the Attorney General points out, the evidence of defendant's guilt was overwhelming. Destiny testified in detail about the sexual abuse she suffered. Destiny's testimony was supported by both her mother and defendant's grandniece, Elizabeth. It is not reasonably probable the verdict would have been more favorable to the defendant had the trial court sustained defendant's objection to the prosecution's references to rape during Destiny's direct examination. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Not only was the evidence of sexual assault strong, the jury was not in any way mislead by the prosecution's rape references or compromised by the court overruling defendant's objection.

### 2. Referencing "Consent"

After defendant testified on direct examination that he and Destiny "just had sex," defense counsel asked: "And this was consensually?" to which defendant responded "Yes." Upon the prosecutor's objection that "[c]onsent calls for a legal term," the court struck the response. Counsel immediately rephrased his question, asking "Did you ever hear her say 'no'?" Defendant answered "No." Counsel followed up by asking who initiated the sex, to which defendant responded "Actually, she did."

Defendant argues that 'consent' is a commonly understood term that does not require a legal definition. We agree. Like the term 'rape,' the term 'consent' is commonly understood in the vernacular. But consent also has a legal definition in the context of a rape allegation. The prosecution must prove that Destiny "act[ed] freely and voluntarily and kn[e]w the nature of the act." (CALCRIM No. 1000.) In the same way that 'rape' has a legal meaning in this case, so too does consent.

But here again, even if the court's evidentiary ruling was error, the error is harmless. The jury was properly instructed on consent, and defendant was not prevented from eliciting testimony regarding whether Destiny acted freely and voluntarily. Indeed, throughout his direct examination, defendant told the jury that Destiny initiated and willingly participated in all of the sexual acts. Furthermore, as we have already stated, the evidence of defendant's guilt was overwhelming.

### 3.    Defendant's Due Process Claim

Defendant argues that his due process right to a fair trial was violated by the court's "imbalance[d]" evidentiary rulings. Although defendant did not raise a due process claim in the trial court, his claim is not forfeited on appeal because defendant's assertion is that the trial court's error had the additional legal consequence of violating his right to due process. (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Nevertheless, we reject defendant's claim. For the same reasons we conclude that any error in the trial court's evidentiary rulings is harmless under state law, we also conclude that any such error did not render defendant's trial fundamentally unfair. (*Id*. at p. 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."], original italics.)

### B.    THE AMENDED INFORMATION

Defendant argues that the trial court abused its discretion by permitting amendment of the information at the close of evidence to charge the Stanislaus County conviction under the three strikes law. Defendant further alleges that his due process and Fifth Amendment rights were violated by the late amendment because his trial strategy, including his decision to testify, was based on the original information in which the Stanislaus County conviction was charged only under the one strike law. He contends that the error was both prejudicial under *Chapman v. California* (1967) 386 U.S. 18 and structural because "it is impossible to assess whether [he] would have prepared his defense differently or decided not to testify had he received [earlier] notice . . . ." He also

alleges prejudicial sentencing error under *People v. Watson, supra,* 46 Cal.2d 818 because the amended information exposed him to a doubling of his sentence. We find no merit to defendant's arguments.

Section 969a authorizes courts to permit amendment to charge a prior conviction "[w]henever it shall be discovered . . . that a pending information does not charge all prior felonies . . . ."[2] An information may not be amended to add prior conviction allegations after the jury has been discharged. (*People v. Tindall* (2000) 24 Cal.4th 767, 782 (*Tindall*).) Before the jury is discharged however, a court may grant or deny permission in its discretion. (*People v. Valladoli* (1996) 13 Cal.4th 590, 606, fn. 3 (*Valladoli*).)

In *Valladoli*, the Supreme Court addressed whether section 969a permits amendment after the jury renders a verdict for the substantive crimes charged in the information but before the jury is discharged. (*Valladoli, supra,* 13 Cal.App.4th at p. 594.) Rejecting the argument that section 969a is aimed at permitting amendment of previously *unknown* prior felony convictions as opposed to *uncharged* prior felony convictions known to the prosecutor, *Valladoli* explained that section 969a provides for amendment to charge (1) a previously known prior felony conviction, (2) a newly discovered prior felony conviction, and (3) a prior felony conviction omitted through clerical error. (*Valladoli,* at pp. 605–606.) Because the omission in *Valladoli* was due to clerical error, the court did not address whether section 969a would authorize amendment when a prosecutor intentionally delayed charging a prior felony conviction enhancement. (*Valladoli,* at p. 607.)

---

[2] Section 969a provides: "Whenever it shall be discovered that a pending indictment or information does not charge all prior felonies of which the defendant has been convicted either in this State or elsewhere, said indictment or information may be forthwith amended to charge such prior conviction or convictions, and if such amendment is made it shall be made upon order of the court . . . . Defendant shall promptly be rearraigned on such information . . . as amended and be required to plead thereto."

*Valladoli* provided an illustrative list of factors for courts to consider to assure protection of a defendant's due process rights when the prosecution seeks to amend under section 969a. The factors include: "(i) the reason for the late amendment, (ii) whether the defendant is surprised by the belated attempt to amend, (iii) whether the prosecution's initial failure to allege the prior convictions affected the defendant's decisions during plea bargaining, if any, (iv) whether other prior felony convictions had been charged originally, and (v) whether the jury has already been discharged [citation]." (*Valladoli*, *supra*, 13 Cal.4th at pp. 607–608, fn. omitted.)

In defendant's view, the trial court abused its discretion under the above factors because (1) the prosecutor's late amendment must have been intentional, (2) defendant was surprised by the late amendment because he did not know the prosecutor would amend the information to allege the prior conviction under the three strikes law, and (3) defendant's trial tactics and strategy were "profound[ly]" impacted by the omission of the three strikes allegation in the original information.

We are not persuaded. There is no indication that the prosecutor intentionally delayed seeking the amendment, and we will not infer prosecutorial malfeasance without support in the record. Nothing here indicates that the late amendment was anything other than correction of an oversight. The record shows that the prosecutor raised the matter during a jury instruction conference off the record before making the request on the record. If defendant had any basis to claim intentional delay, he had the opportunity to put his concern on the record, and he did not do so.

We also do not accept defendant's surprise argument and its impacts on his trial strategy. Defendant was fully aware of his prior conviction, and the California Supreme Court's *Valladoli* and *Tindall* decisions put him on notice that that the information could be amended to add a three strikes allegation any time before the jury was discharged. While he may not have known that the information ultimately would be amended, he knew that the conviction was alleged and knew (or should have known) that the

information could be amended as long as the jury was in service.  We find no violation of defendant's constitutional rights, and no error in allowing amendment of the information based on lack of prejudice to defendant.

### III.  DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Márquez, J.